QUATTLEBAUM *v.* BUSBEA.

4-6631                                          162 S. W. 2d 44

Opinion delivered April 20, 1942.

*Rowland H. Lindsey* and *R. W. Robins,* for appellant.

*Yingling & Yingling,* for appellee.

GRIFFIN SMITH, C. J.   Two teachers, one former teacher, three bus drivers, also directors of Floyd Special School District No. 37 of White county, and others, were sued by thirty-nine taxpayers.   Charges were fraudulent diversions of school money.[1]

---

[1] In substance, appellees' abstract of charges is: ". . . said board of directors purchased in the name of the school district a school bus for one of the defendant bus drivers and issued the warrants of the district in payment thereof; that the defendant Cal Aclin, doing business as Searcy Truck and Tractor Company, who was agent of International Harvester Company, was a party to the fraudulent purchase by the district of said school bus; that warrants were issued to certain of the school directors for alleged services performed by them in violation of the law; that illegal warrants drawn by said board of directors were in possession of Security Bank, some of which had been paid and charged to the district; that certain warrants had been drawn payable to said bank purporting to be for services performed by the bank; that bus drivers were related within the prohibited degree to certain directors and had been employed illegally.

"Appellants made denial, after which they admitted certain allegations by affirmatively pleading that warrants were issued in payment of expenses incurred and services performed by designated directors, and that warrants had been issued to bus drivers and teachers, purporting to be for services rendered the district by them, but which were in fact to pay for a gymnasium, it being alleged the warrants were issued against the 'equalizing fund,' with respect to which they expressly pleaded that 'the directors contend that if they have violated the laws, the state board of education has jurisdiction over them, and taxpayers are without authority to sue, especially since the

Appellants, who were defendants below, stress the fact that those against whom judgments were rendered did not benefit personally by the transactions complained of. They say the district received value for all warrants issued, although process by which funds were withdrawn from the treasury was admittedly illegal. Limitation is pleaded.

When employed, each of the three bus drivers was related to one or more of the directors within the pro-hibited degree.[2] There was no satisfactory proof, it is argued, that two-thirds of the school patrons signed petitions requesting directors to employ teachers who were related to members of the board within the fourth degree. [But see Act 389, approved March 26, 1941.]

Employment of J. R. Lammers as janitor is an example of indirect methods to which recourse was had. Griffin, a teacher, was authorized by the directors to hire a janitor. He engaged Lammers. Payment was accomplished by adding Lammers' salary to Griffin's compensation. Effect was that school records did not disclose Lammers' dual status: janitor and member of the board.

O. T. Dulaney was chairman of the board. A bus was purchased in the district's name for O. L. Dulaney, who was O. T.'s brother. Sales tax was paid by the district.

During December, 1939, on a salary of $100 per month, O. L. Dulaney, as bus driver, drew more than $600. He admitted the bus was purchased as his personal property, although postdated school warrants issued in part payment August 1, 1938, were outstanding when suit was filed November 5, 1940.

While O. T. Dulaney was chairman, Thomas, a brother-in-law, operated a bus for the district under con-

matters they object to were paid out of equalizing funds and not local taxes or the state apportionment.' The answer made the further defense that the district had received benefit of all funds so expended."

[2] Section 97, Act 169, approved March 25, 1931; Pope's Digest, § 11535. Although other subdivisions of § 97 have been amended, subdivision "d" regulating employment of teachers was not affected prior to 1941.

tract. It belonged to Dulaney, who testified Thomas procured it by lease.

Significance attaches to the fact that payment of $250 by warrant was made to M. D. King, a teacher. This occurred, it is said, before the district contracted with him. King purchased real property from O. T. Dulaney (as appellees' counsel expresses it) ". . . about the same date, paying therefor $250. While King would not admit the warrant was issued to enable him to make the purchase, he did not deny it."

Copies of teacher and bus driver contracts were not filed, as provided by law.

O. T. Dulaney, while chairman, used his truck to transport lumber and other building materials for the district and was substantially compensated. He was paid in cash realized from excess amounts added to salaries of teachers and bus drivers.

There were many irregularities. The marginal tabulation[3] shows twenty-four items found by the court to have been fraudulent. O. L. Dulaney settled for the postdated warrants. King also settled. Charges against C. A. Turpin, L. M. House, M. D. King and his wife, Cal Aclin, International Harvester Company, and Mrs. John V. Crockett, county treasurer, were dismissed. The tabulation is an itemization of judgments, all of which were joint and several, and amounted to $2,209.61. Security Bank paid $174.62 (the amount adjudged against it representing sums added to warrants payable to O. T. Dulaney and cashed by the bank). Net judgments, exclusive of interest, are $2,034.99.

Quoting from appellants' brief, "The greater part of the transactions complained of arose from the attempt of directors to complete a gymnasium building, also used for class rooms." The building was a National Youth Administration project. When nearly finished, but without a roof, NYA apportionment of funds ceased. The school directors claim they were advised it was legal to divert money from the transportation budget. The

³ JOINT AND SEVERAL JUDGMENTS AGAINST TEN DEFENDANTS. TABLE SHOWS TWENTY-FOUR ITEMS ILLEGALLY PAID, AND THOSE WHO ARE LIABLE.

| Items No. | Amount | O.L. Dulaney | O.T. Dulaney | J.W. Quattlebaum | S.I. Stroud | J.R. Lammers | J.H. Bradberry | Elbert Barnett | J.C. Griffin | A.L. Quattlebaum | Security Bank & Trust Co. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $ 118.25 | $118.25 | $ 118.25 | $ 118.25 | $ 118.25 | $118.25 | $ 118.25 | | | | |
| 2 | 354.75 | 354.75 | 354.75 | 354.75 | 354.75 | | 354.75 | $ 354.75 | | | |
| 3 | 235.00 | | 235.00 | 235.00 | 235.00 | | 235.00 | 235.00 | | $235.00 | |
| 4 | 15.00 | | | 15.00 | | | | 15.00 | | | |
| 5 | 101.00 | | 101.00 | 101.00 | 101.00 | 101.00 | 101.00 | | $101.00 | | |
| 6 | 25.00 | | 25.00 | 25.00 | | | | | | | |
| 7 | 40.00 | | 40.00 | 40.00 | | 40.00 | | | | | |
| 8 | 90.00 | | 90.00 | 90.00 | | 90.00 | | | | | |
| 9 | 15.00 | | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | | | | |
| 10 | 170.00 | | 170.00 | 170.00 | 170.00 | 170.00 | 170.00 | | | | |
| 11 | 85.00 | | 85.00 | 85.00 | 85.00 | 85.00 | 85.00 | | | | |
| 12 | 6.00 | | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | | | | |
| 13 | 229.00 | | 229.00 | 229.00 | 229.00 | | 229.00 | 229.00 | | | |
| 14 | 15.00 | | 15.00 | 15.00 | 15.00 | | 15.00 | 15.00 | | | |
| 15 | 40.00 | | 40.00 | 40.00 | 40.00 | | | | | | |
| 16 | 30.00 | | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | | | | |
| 17 | 22.50 | | 22.50 | 22.50 | 22.50 | 22.50 | 22.50 | | | | |
| 18 | 10.00 | | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | | | | |
| 19 | 173.73 | | 173.73 | 173.73 | 173.73 | 173.73 | 173.73 | | | | |
| 20 | 16.80 | | 16.80 | 16.80 | 16.80 | 16.80 | 16.80 | | | | |
| 21 | 75.25 | | 75.25 | 75.25 | 75.25 | | 75.25 | 75.25 | | | |
| 22 | 20.96 | | 20.96 | 20.96 | 20.96 | | 20.96 | 20.96 | | | |
| 23 | 174.62 | | | | | | | | | | $174.62 |
| 24 | 146.75 | | 146.75 | 146.75 | 146.75 | | 146.75 | 146.75 | | | |
| | $2,209.61 | $473.00 | $2,019.99 | $2,034.99 | $1,824.99 | $878.28 | $1,824.99 | $1,091.71 | $101.00 | $235.00 | $174.62 |
| | 174.62* | | | | | | | | | | |
| | $2,034.99 | | | | | | | | | | |

* Paid by Bank.

credit thus tapped by padding strategy came to the district from the state equalizing fund.[4]

When money from the equalizing fund is paid to school districts, it becomes property of the payee, subject only to such control as the state has imposed. See § 142 and subsequent sections of Act 169 of 1931.[5] The state board of education is empowered to make such reasonable rules as may be necessary to administer the equalizing fund. A regulation is that failure to supply required information shall disqualify the delinquent district from right of allotment. The report must be available to the commissioner of education not later than June 30 of each year. Changes in rules have been made as necessity and as efficient administration required.

[4] Floyd School District No. 37, beginning with 1935, received remittances from the equalizing fund as follows: 1935-36, $1,895.68; 1936-37, $1,839.90; 1937-38, $3,454.46; 1938-39, $3,106.60; 1939-40, $3,261.47; 1940-41, $4,176.06; 1941-42, $5,180.94. Expenditures reported (the first amount being for teachers' salaries, and the second sum representing transportation) were: 1933-34, $1,720; $210. 1934-35, $2,184. none. 1935-36, $2,205; $1,050. 1936-37, $2,600; $1,260. 1937-38, $2,800; $1,800. 1938-39, $3,240; $1,880. 1939-40, $2,964; $2,220. 1940-41, $4,360; $3,781. 1941-42, teachers' salaries as shown by contracts (actual payments not available), $3,870; transportation figures not available.

Beginning with the 1935-36 school year, reports made to the department of education show: Two buses operated on contract basis, one at $85 per month for seven months and one at $65 per month for the same period. 1936-37, three operated on contract basis presumably for eight months. Contract salaries were $75, $75, and $65 per month. This would show a total of $1,800 for the year, and does not correspond with $1,260 reported. For 1937-38 two buses were operated on contract basis. Original report shows each at $600 per year. A correction not shown by the report reflects $900. In 1938-39 three buses were utilized under contract. Payments of $520, $600, and $760 were reported. During 1939-40 operation of four buses was reported, with payments of $800, $600, $520, and $300: total, $2,220. [Oscar Dulaney, eight months at $100; Ira Stroud, eight months at $75; Arthur Quattlebaum, eight months at $65, and John Burkett, six months at $50]. For 1940-41, seven buses were operated, six under contract for payments of $600, $529, $860, $480, $480, and $390: total, $3,339. Driver of the district-owned bus was paid $200, and operating expenses were $242, a total of $442, giving a grand total of $3,781. [S. I. Stroud was paid $75 per month for eight months, O. Dulaney $100 for eight months, Arthur Quattlebaum $65 for eight months, and John Burkett $60 for eight months]. Contracts reported for 1941-42 are for $520, $640, $600, and $160 for eight months, $201.25 for one and three-fourths month, and $105 for one and three-fourths month.

[5] Pope's Digest, § 11584, *et seq.* [For source of additional funds, see Act 334, approved March 16, 1939; also see Act 345, approved March 16, 1939].

Appellants' first contention is that the money (found by the court, in effect, to have been siphoned from the treasury) was spent by the directors "in entire good faith." It would perhaps be more accurate to say there was no diversion for personal gain.

Faced by NYA's failure to complete the gymnasium, those who conceived this plan of financial triangulation for obtaining money, and those who lent themselves to the scheme, no doubt justified the expedient as the only available means to an end.

A judgment holding that a member of the Brinkley town council was liable for tiling he sold the municipality was reversed in *Frick* v. *Brinkley,* 61 Ark. 397, 33 S. W. 527. The opinion by Chief Justice BUNN held the transaction was illegal. But the town, he said, could not in good conscience retain benefits and recover the purchase price. The decision was that while the statute prohibited councilmen from being interested in profits of any contract or job for work or services to be performed for the corporation, Frick's sale of tile could not ". . . necessarily or even reasonably be considered a 'contract or job for work or services to be performed,' as is contemplated by the statute." The question, as stated by the chief justice, was: ". . . where the contract made is not void in the strict sense, but only voidable, and where it has been fully executed by both parties, and the object of the litigation is, in effect, to annul and rescind," what were the relative rights? The case turned on one proposition: the relief sought could only be granted on the principles of right and justice, ". . . and these [were] not with the plaintiff."

Attention is called to *Smith* v. *Dandridge,* 98 Ark. 38, 135 S. W. 800, 34 L. R. A., N. S., 129, Ann. Cas. 1912D, 1130, where it was held that even though a school director could not make a binding contract with the district to pay a director an agreed sum for services performed outside his official duties, yet if the district should accept benefits it ought to make just compensation. *Spearman* v. *Texarkana,* 58 Ark. 348, 24 S. W. 883, 22 L. R. A. 855, is cited in

the Dandridge case. Mr. Justice Frauenthal made comment, as shown below.[6]

Mr. Justice Wood, speaking for the court in *Hendrix* v. *Morris*, 134 Ark. 358, 203 S. W. 1008, said that in order to make school directors liable it was essential to allege that the wrongful act was wilfully and maliciously done.

These arguments are answered in the case at bar by the facts. However meritorious appellants may have thought the transactions were, to consummate them it became necessary to falsify records. By this departure from the law it was possible to draw money from the treasury for the masked purpose in view.

Because there was deceit and concealment, limitation as a plea is unavailing. Agreement between the actors constituted a conspiracy which became consummate when warrants showing upon their face that they were for a designated purpose were in fact issued for a wholly different end. While the fraudulent motive actuating execution of the warrants remained undisclosed there was concealment, and the statute did not begin to run. *Conditt* v. *Holden*, 92 Ark. 618, 123 S. W. 765, 135 Am. St. Rep. 206.

In rendering judgment, the chancellor correctly declared the law. Affirmed.

---

[6] "A director is disabled from making a binding contract with the school district, not because the thing contracted for is itself illegal or tainted with moral turpitude, but because his personal relation to the district as its agent requires that he should have no self-interest antagonistic to that of the district in making a contract for it."